# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

SHARON S. SHIELDS,           :

         Plaintiff,         :

  vs.                    :

MICHAEL J. ASTRUE,       :
    Commissioner of the Social
    Security Administration,    :

        Defendant.      :

Case No. 3:08CV0467

District Judge Thomas M. Rose
Magistrate Judge Sharon L. Ovington

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Sharon S. Shields sought financial assistance from the Social

Security Administration by applying for disability insurance benefits ["DIB"] and

supplemental security income  ["SSI"] on November 24, 2003, alleging a

disability onset date of October 1, 2001.  (Tr. 13, 58, 75).  She claims to be disabled

from the combined effects of the following medical conditions: morbid obesity;

restrictive lung disease triggered by morbid obesity; bilateral carpal tunnel

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

syndrome; arthralgias of both knees, the lumbar spine, the left upper arm and the right shoulder; venous stasis with left ankle swelling; anxiety and depression.

After various administrative proceedings, including a hearing held on February 15, 2007 (*see* Tr. 372-438), Administrative Law Judge ["ALJ"] Thaddeus J. Armstead, Jr. issued a decision dated August 2, 2007, denying Plaintiff's DIB and SSI applications based on the ALJ's conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 13-25). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #12), the Commissioner's Memorandum in Opposition (Doc. #15); Plaintiff's Reply (Doc. #17), the administrative record, and the record as a whole.

II.     BACKGROUND

Plaintiff, who was born on March 28, 1951, was 50 years old on the alleged disability onset date, and thus was considered to be "closely approaching advanced age" for purposes of resolving her social security claim. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). Before the hearing and the date of the ALJ's decision,

she turned 55 and thus became a person of "advanced age." *See* 20 C.F.R. §§ 404.1563(e), 416.963(e). Plaintiff has a high school education. (Tr. 380); *see* 20 C.F.R. §§ 404.1564(b)(4); 416.964(b)(4). Plaintiff had worked as a sewing machine operator and as a nurse's aide. (*See* Tr. 23, 421-22).

Subsequent to the denial of the claim now pending before this Court on appeal, Plaintiff filed a second SSI claim. (*See* Doc. #12 at 10). Although this Court previously denied Plaintiff's motion to expand the record to include documents related to that second claim (*see* Doc. ## 11, 18), Plaintiff's statement of specific errors reflects that her second claim was allowed as of August 28, 2008, the date of her second SSI application (*see* Doc. #12 at 10), based in large part on a pulmonary function test performed in October 2008 that showed "moderate obstructive airway disease." (*See* Doc. #11, Exh. 4). Plaintiff insists that had a pulmonary function test been performed before ALJ Armstead's August 2, 2007 decision, it would have demonstrated that she was limited to the "light" exertional level, and thus disabled at that time. (*See* Doc. #12 at 15).

At the hearing on February 15, 2007, Plaintiff testified that she was five feet, eight inches tall, and had weighed around 300 pounds for about four years. (Tr. 377-78). She was married to a man who was incarcerated, and had no minor children, but did have a friend sharing her apartment. (Tr. 378-79). Plaintiff had

not driven since 1990 and had no source of income, so she relied on that friend to transport and support her. (Tr. 379-80). She smoked "[m]aybe a quarter of a pack a day" of cigarettes that her friend purchased. (Tr. 415-16). She had taken a course in the mid-1990s to become a nursing assistant , but had not worked since October 1, 2001. (Tr. 381-82; 410). Among her various previous jobs, she had worked for more than 90 days on a full-time basis only as a nurse's aide and a sewing machine operator. (Tr. 421-22).

Plaintiff testified that carpal tunnel syndrome, which began in 2001 (Tr. 412), caused her to quit working as a nurse's aide. (Tr. 410). "I couldn't feed people anymore because I couldn't hold things and be sure that I could hold it without hurting them." (*Id.*; *see also* Tr. 385). After an EMG, a doctor told her that she needed surgery to correct the carpal tunnel syndrome, but she did not have the operation. (Tr. 412-13). The condition affects both hands, and causes her arms to get "tingly" – "like little needles" – up to her shoulders, and her fingertips to get numb. (Tr. 413). She drops things – "I've dropped coffee before, cups of coffee." (*Id.*).

Plaintiff also had been suffering from shortness of breath for about four or five years. (Tr. 411). She had never been to a specialist for a pulmonary function test and did not take any type of medication for her breathing problem. (*Id.*; *see*

*also* Tr. 414).  She testified that "I tire quickly if I'm walking or climbing stairs or something like that.  I tire very quickly" due to shortness of breath.  (Tr. 411-12).

Plaintiff had no health insurance and no regular doctor, so she received medical treatment from public clinics.  (*See* Tr. 380, 383-84, 411, 412).  The clinic prescribed her blood pressure medication, and had performed an ultrasound for swelling of her arm.  (Tr. 413-14).  She also was diagnosed with arthritis in her knees.  (Tr. 415).  "My knees ache all the time.  . . .  I don't stand for long times.  I have to sit and elevate, especially the left knee."  (*Id.*).  Plaintiff testified that she sits on the couch and for "the better part of the day" (Tr. 417) keeps her left leg elevated, and sometimes both legs.  (Tr. 418).  She estimated that she could stand for 15 to 20 minutes at a time, and about an hour in an eight-hour day (Tr. 419); could walk for about the same duration; and could lift 10 pounds for a third of a day.  (Tr. 420).  Doctors had not given her any medication for the knee pain, although they had told her to lose weight.  (Tr. 415).  Plaintiff also complained of leg and back pain, which she treated with acetaminophen or ibuprofen, not prescription medication.  (Tr. 415-16).

Plaintiff testified that she had been treated at the Miami County Mental Health Center for depression "on and off since 2004."  (Tr. 383-84).  She was seeing nurse practitioner LaDonna Ross on a monthly basis, and "occasionally"

seeing psychiatrist Dr. Nims. (Tr. 384-85). She began treating there because "I was so depressed that I just couldn't take it anymore and I needed somebody to talk to about it." (Tr. 384). Saying that she had "trouble sleeping" and did "not react well around people," Plaintiff described her symptoms as "[n]ot being able to go anywhere or do anything because . . . I don't want to be around people." (*Id.*). "I've gained an enormous amount of weight. The [ ] treatment helps, but . . . I'm still not leaving my house to do things . . . that I used to do." (Tr. 385).

Plaintiff said that she would go to the grocery store "[m]aybe once a week," at times when few people were likely to be there. (*Id.*). Despite taking Seroquel to sleep, she would nap two hours in the afternoon and might sleep two hours at night. (Tr. 386). "I'm awake a lot," because "I just can't sleep. I lay down to go to sleep and my mind is just racing . . ." (*Id.*). She described being "tired all the time" (*id.*), which she attributed in part to depression. (Tr. 387). She also testified to having "limited" concentration: "I used to read a lot. I can't do that because I just don't . . . comprehend a lot of it." (*Id.*). After reading for about 15 minutes, "my mind is floating somewhere else. I'm not paying attention to what I'm doing." (*Id.*). She testified that she also paid no attention to television, but kept it on "all the time" just for the "noise." (*Id.*).

Asked about her history of three arrests for driving under the influence of alcohol, Plaintiff testified that she last received a DUI in 1990, and now drinks "not half as much" as she did then. (Tr. 389). For over a year, she has drunk beer "maybe once a month if [ ] a friend [ ] comes over," but limits her intake to "maybe two cans" due to interaction with medication. (Tr. 389-90). Before that, she drank "[p]robably a six pack" once a week. (Tr. 390). She never had any treatment related to alcohol use. (*Id.*).

Plaintiff indicated that she socializes with a neighbor who drops by occasionally to bring her magazines or takes her to the grocery store. (Tr. 390-92). She testified that she rides in a power cart when grocery shopping. (Tr. 420).

Vocational expert {"VE"] William Braunig also appeared as a witness at the hearing. (Tr. 420, 422-437). He testified that Plaintiff's past work as a nurse's aide would be classified as medium, semi-skilled, and her work as a sewing machine operator would be light, semi-skilled. (Tr. 422). The ALJ posed a hypothetical, asking the VE to assume someone of Plaintiff's age, education and work experience, who was limited to occasional climbing of ladders, ropes and scaffolds; frequent kneeling, crawling, crouching or stooping; no prolonged walking; small group settings and non-essential occasional contact with co-worker, supervisors and the public; no complex tasks or tasks requiring fast pace

or production quotas; and non-repetitive, non-strenuous gross manipulation and fine fingering in both hands and upper extremities "for three hours spread over a day." (Tr. 422-25). The VE said that such limitations would rule out Plaintiff's past relevant work as a sewing machine operator (Tr. 425, 428), and might or might not rule out nurse's aide work. (Tr. 426-428). Limiting kneeling, crouching, crawling and stooping to only "occasional" would not affect the nurse's aide job, but limiting overhead reaching to only "occasional" would eliminate work as a nurse's aide. (Tr. 428).

Even with "occasional" overhead reaching, however, the VE testified that 22,000 positions would exist at the medium exertion level, including dining room attendant and groundskeeper. (Tr. 429). At the light level, 12,000 positions would exist, such as mail clerk or photocopy machine operator. (*Id.*).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources.

*Pre-Filing Medical Records*[2]  On August 1, 2001, Plaintiff was seen in the emergency department at Upper Valley Medical Center for recent onset of tingling and numbness in her face and hands, difficulty concentrating, nausea, shortness of breath, and chest tightness.  (Tr. 153).  Although Plaintiff had "abnormal breath sounds," a chest x-ray was negative.  (Tr. 154).  Concluding that Plaintiff's symptoms probably were the result of bronchospasm, hypoglycemia (from skipping breakfast) and possibly a subclinical viral syndrome, the emergency room physician gave Plaintiff an inhaler and discharged her "in good, stable and nontoxic condition."  (Tr. 155).

The next record evidence of medical treatment shows that in July 2002, Plaintiff appeared in the same emergency department for complaints of pain in her lower left leg after tripping.  (Tr. 157).  On exam, Plaintiff exhibited "mild tenderness."  (Tr. 158).  She was discharged with a prescription for Ibuprofen for pain and inflammation, plus Tylenol 3 for any "breakthrough pain," and was instructed to elevate the leg as much as possible.  (*Id.*).

---

[2] Plaintiff's Statement of Errors does not mention <u>any</u> medical records pre-dating her initial DIB and SSI applications, instead relying exclusively on the opinions of Drs. Boerger, Danopulos and Nims, and that of Ms. Ross.  (*See* Doc. #12 at 9-10, 12-13).  The Commissioner, however, acknowledged Plaintiff's pre-2004 medical history in his opposing memorandum.  (*See* Doc. #15 at 2-4).

Plaintiff next was treated in October 2003, when she went to the emergency room with complaints of pain in her right hand. (Tr. 160). Examination revealed "mild tenderness and some swelling." (Tr. 161). Plaintiff was diagnosed with tendinitis, prescribed Darvocet, instructed to ice and elevate her hand, and discharged in good condition. (*Id.*).

On November 14, 2003, Plaintiff saw Dr. Ronal D. Manis, Jr. for right hand discomfort that continued up her arm at the neck. (Tr. 172). Dr. Manis assessed Plaintiff with possible cervical radiculopathy. (*Id.*). An x-ray of her cervical spine revealed minimal spurs developing. (Tr. 164). Chest x-rays were normal, with "[n]o . . . evidence of active pulmonary disease." (Tr. 165). On follow up, Plaintiff reported continued tightness in her right neck and "a bit of discomfort" in her right hand, but that she felt better. (Tr. 170). Dr. Manis referred her to physical therapy and instructed her to return in one month. (*Id.*).

The record contains no indication that Plaintiff attended physical therapy or that she followed up with Dr. Manis. However, in February 2004, Dr. Stephen W. Duritsch conducted electomyoneurography ["EMG"] testing of Plaintiff's arms. (Tr. 213-14). Dr. Duritsch diagnosed Plaintiff with severe bilateral carpal tunnel syndrome without peripheral neuropathy or cervical radiculopathy. (Tr. 214).

*Alan R. Boerger, Ph.D.*  Dr. Boerger, a psychologist, examined Plaintiff on April 9, 2004, on behalf of the Ohio Bureau of Disability Determination ["BDD"]. (Tr. 215-19).  Opining that she "appear[ed] to be in need of outpatient mental health treatment," he diagnosed her with generalized anxiety disorder, dysthymic disorder, carpal tunnel syndrome in both hands and "large weight gain," and assessed a GAF of 51.  (Tr. 219).  Dr. Boerger opined that Plaintiff would be moderately to markedly restricted in her ability to relate to supervisors and fellow workers and to withstand the stress and pressures associated with day-to-day work activity; mildly to moderately restricted in her ability to understand and follow instructions; and that she "may be mildly impaired" in her ability to maintain attention to perform simple repetitive tasks.  (*Id.*).

*Bob L. Stinson, Psy.D.*  Dr. Stinson, a state agency psychologist, reviewed the record on April 20, 2004.  (Tr. 220-36).  Although he concurred in the diagnoses of dysthymic disorder and generalized anxiety disorder (*see* Tr. 227, 229), he opined that Plaintiff's mental impairments did not meet or equal any Listing (Tr. 235), and that she appeared to be "capable of understanding, remembering, and carrying out simple work related tasks in a low stress environment that does not require her to work closely with others."  (Tr. 222).  A

hand-written note indicated that Plaintiff also is "capable of moderately complex tasks in spite of her [mental disorder], based on her daily functioning." (*Id.*).

*J. Rod Coffman, Ph.D.* Dr. Coffman, another state agency reviewing psychologist, affirmed Dr. Stinson's findings on April 20, 2004. (Tr. 224).

*Robert F. Malarkey, M.D.* Dr. Malarkey, an orthopedic surgeon, saw Plaintiff on June 7, 2004, for a broken right index finger. (Tr. 191). Although Plaintiff cancelled her next follow-up appointment, an x-ray at the end of June revealed "early good healing of the fracture." (*Id.*). In July 2004, Dr. Malarkey concluded that the finger had "healed well," and recommended hand therapy for stiffness. (Tr. 190). In September 2004, he reported that Plaintiff had "improved significantly" despite attending only six of 12 therapy sessions. (*Id.*). Dr. Malarkey also commented on an eight-month old EMG report brought in by Plaintiff, suggesting that she wear a wrist brace on each hand for "severe carpal tunnel syndrome," and that she "might need surgery on this . . . in the future." (*Id.*).

*Damian M. Danopulos, M.D.* Dr. Danopulos also evaluated Plaintiff on behalf of the Ohio BDD, on October 6, 2004. (Tr. 173-79). As a result of his examination and Plaintiff's history, he diagnosed restrictive lung disease triggered by morbid obesity; non-specific headaches; neuralgias and myalgias in

the left upper arm, right shoulder and right shoulder blade; abdominal hernia in the upper abdomen without any tendency for strangulation; bilateral carpal tunnel syndrome, worse on the right; arthralgias of the lumbar spine and both knees; venous stasis with left ankle swelling; and morbid obesity. (Tr. 179). He noted that Plaintiff's ability to do any work-related activities "like standing, walking, carrying" was restricted by her "early lumbar spine arthritis . . . plus her moderately severe restrictive lung disease," both impacted by her morbid obesity. (*Id*.). He also noted that her diminished right grip negatively affected her ability to use her right hand. (*Id*.).

*Robert A. Weisenburger, M.D.* Dr. Weisenburger, a state agency physician, reviewed the record on November 16, 2004, and prepared a physical residual functional capacity assessment of Plaintiff. (Tr. 204-11). He indicated that Plaintiff could stand and/or walk about six hours in an eight-hour day; frequently could lift 25 pounds; occasionally could lift 50 pounds; could engage in unlimited pushing or pulling (Tr. 205), although handling and fingering were limited to "the lower ranges of frequent" (Tr. 207); and occasionally could climb ladders, ropes or scaffolds. (Tr. 206).

*Miami County Mental Health Center* Plaintiff had been seen by various individuals at the mental health center since August 4, 2004. (Tr. 238-354). On

August 11, 2006, LaDonna Ross, a counselor who had treated Plaintiff, completed

an assessment of Plaintiff's mental abilities, which also was signed by Peter E.

Nims, M.D., a psychiatrist. (Tr. 243-45). They indicated that Plaintiff had no

ability to complete a normal workday or workweek without interruptions due to

psychologically-based symptoms (Tr. 244); and had "limited and unsatisfactory"

ability to remember work-like procedures, maintain attention, maintain regular

attendance and be punctual, and accept instructions and respond appropriately

to criticism from supervisors. (Tr. 243-44). In that document, they also stated as

follows:

> Sharon is depressed and anxious – any change (major)
> in situation increases these problems, the depression or
> anxiety increases the difficulty to be able to concentrate,
> and remember complex instructions. She becomes
> overwhelmed by criticism.

(Tr. 245). They indicated that Plaintiff had been so restricted since at least

October 1, 2001. (*Id.*).

_Health Partners of Miami County_  On July 27, 2006, Plaintiff was seen for

complaints of chest pain, feeling faint, a swollen left upper arm, ankle swelling,

and "tingling" in both feet and legs. (Tr. 358). She was diagnosed with

hypertension, fluid retention and GERD [gastroesophageal reflux disease]. (*Id.*).

She returned on September 19, 2006, again with tingling and left arm swelling

that the doctor deemed "chronic." (Tr. 356). A chest x-ray taken that month showed no evidence of active pulmonary disease. (Tr. 360). A November 2006 ultrasound of her left upper arm revealed no evidence of thrombosis, but was "consistent with chronic stenosis of [the] left brachial vein." (Tr. 359).

_Dr. Terry Schwartz_  Dr. Schwartz, a psychologist (_see_ Tr. 376, 405), testified as an impartial medical expert at the hearing before the ALJ. (Tr. 375, 376-77, 383, 393-409). Based on a review of Plaintiff's records (_see_ Tr. 383), he determined that there were no records of any mental health treatment until April 2004. (Tr. 395-96, 398-99). When she presented at that time, despite diagnoses of generalized anxiety and dysthymic disorder and a GAF of 51, testing by a psychologist showed that Plaintiff "was able to recall eight digits forward and seven digits backward," or "in the average to above average range in terms of attention and concentration." (Tr. 394). A social worker's notes in November 2004 indicated that Plaintiff did not complete homework assignments or implement suggestions, and also "no-showed for one session and cancelled six." (_Id._; _see also_ Tr. 403). In January 2006, another therapist reported that Plaintiff "has been going places and doing things she has not done for ages – cooked for Thanksgiving, getting out of the house, shopping, not worrying, more relaxed, not as irritable." (Tr. 395; _see also_ Tr. 404, 406-07).

Dr. Schwartz noted that some records show "a much more benign picture" and some "more moderate difficulty." (*Id.*; *see also* Tr. 407-08). Based on those inconsistencies, he did not believe that Plaintiff's level of anxiety and depression met or equaled any listing. (Tr. 396). His diagnoses of Plaintiff for the documented period would be "a dysthymic disorder, an anxiety disorder[,] and alcohol dependency and abuse in partial remission since she drinks once a month." (Tr. 397). The only work-related restrictions he would impose would be that Plaintiff be limited "to dealing with small groups;" that any job not be "extremely stressful" in complexity, efficiency or speed (*id.*); and that she have "only occasional contact" with others. (Tr. 408).

## III.   THE DISABILITY REQUIREMENT & ADMINISTRATIVE REVIEW

### A.   Applicable Standards

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is

available in the regional or national economies.[3]  *See Bowen v. City of New York*,

476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim

through a five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).[4]  Although a dispositive finding at any Step

terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007),

if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional

---

[3]Impairments also must be expected either to cause death or last 12 or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

[4]Remaining citations will identify one set of Regulations with full knowledge of the corresponding Regulations.  *See Colvin*, 475 F.3d at 730.

capacity, can the claimant perform other work
available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.     The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the

insured-status requirement for DIB eligibility through September 30, 2004.  (Tr.

15).  The ALJ also found at Step 1 that Plaintiff has not engaged in substantial

gainful activity since her claimed disability onset date of October 1, 2001.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of

morbid obesity; restrictive lung disease secondary to obesity; carpal tunnel

syndrome; arthralgias of the lower spine and knees; a suggestion of venous

stasis; dysthymic and generalized anxiety disorders; and alcohol abuse, in

reported remission.  (*Id.*).  The ALJ determined at Step 3 that Plaintiff does not

have an impairment or combination of impairments that meets or equals the level

of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 16).

At Step 4 the ALJ found Plaintiff capable of performing medium work as

defined for Social Security purposes, with the following exceptions: no prolonged

walking; only occasional kneeling, crawling, crouching, stooping, overhead

reaching, and climbing of ladders, ropes or scaffolds; bilateral gross

18

manipulation and fine fingering "at a level just exceeding occasional and at the lowest level of frequency, say a maximum of 3 hours on the day, but no repetitive strenuous gross manipulation, for example, as in strenuously squeezing or twisting a screw driver;" no complex tasks or tasks requiring fast pace or production quotas; and should work in a small group setting with no more than occasional contact with co-workers and supervisors. (Tr. 20). The ALJ further found that Plaintiff has no past relevant work experience, having "not earn[ed] income consistent with substantial gainful activity" within the relevant time frame. (Tr. 23).

Continuing to Step 5, ALJ Armstead concluded that a significant number of jobs exist in the national economy that Plaintiff is able to perform, including "dining room attendant" and "groundskeeper" at the medium level of exertion, and "officer helper" and "mail clerk" at the light level. (Tr. 23, 24). This conclusion, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI benefits. (Tr. 24).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual

findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance . . .'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and

20

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    DISCUSSION

### A.    The Parties' Contentions

In a cursory list fashion, Plaintiff contends that the ALJ erred in the following eight respects: 1) by finding that Plaintiff was capable of performing work at the "medium" exertional level, despite Dr. Danopulos's report; 2) by failing to consider all limitations of Plaintiff's mental impairment; 3) by failing to consider all limitations of Plaintiff's physical impairments; 4) by failing to consider her obesity in combination with her other impairments, or to consider the effects of the reduced grip in her right hand; 5) by not acknowledging the opinions of Plaintiff's treating mental health sources, which would eliminate all competitive employment; 6) by failing to consider the definition of "medium" work in the context of Plaintiff's limitations; 7) by failing to fully develop the record as to Plaintiff's restrictive lung disease; and 8) by misinterpreting Plaintiff's "relative lack of medical treatment" as indicative that Plaintiff's conditions were not severe rather than due to a lack of health insurance.  (Doc. #12 at 11-15).

In response, the Commissioner argues the ALJ properly evaluated the mental health source opinions and Plaintiff's physical impairments of obesity and carpal tunnel syndrome. (Doc. #15 at 15-16). He contends that the ALJ also properly evaluated Plaintiff's subjective complaints, including his consideration of her "sparse treatment" record (*id.* at 16-17), as well as her daily activities, medication, and failure to comply with treatment recommendations. (*Id.* at 17). He also asserts that the ALJ properly considered all of Plaintiff's physical and mental impairments, and adequately developed the record regarding Plaintiff's pulmonary impairment. (Tr. 18-19). Finally, he urges that the results of Plaintiff's pulmonary function test in October 2008 do not warrant remand. (Tr. 19-20).

Plaintiff seeks an order reversing the ALJ's decision and granting Plaintiff benefits from October 1, 2001, or alternatively, an order granting benefits from March 28, 2006, the date of Plaintiff's 55th birthday, and remanding this case to the Social Security Administration under Sentence 4 to determine whether Plaintiff was disabled between October 1, 2001 and March 28, 2006. (Doc. #12 at 15). The Commissioner seeks an Order affirming the ALJ's decision.

**B.**   **Medical Source Opinions**

    *1.*   *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers*, 486 F.3d at 242; *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a
> treating source medical opinion is not well-supported

> by medically acceptable [data] . . . or is inconsistent with
> other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,'
> not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4.  The Regulations require the

ALJ to continue the evaluation of the treating source's opinions by considering "a

host of other factors, including the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's

conclusions; the specialization of the physician; and any other relevant factors."

*Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the

opinion of a treating physician [or psychologist] is entitled to great deference, its

non-controlling status notwithstanding."  *Rogers*, 486 F.3d at 242.

2.      *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  Social Security Ruling

96-6p, 1996 WL 374180, at *2.  Yet the Regulations do not permit an ALJ to

automatically accept (or reject) the opinions of a non-treating medical source.  *See*

*id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we

will always consider the medical opinions in your case record together with the

rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b).  To fulfill this

promise, the Regulations require ALJs to evaluate non-treating medical source

opinions under the factors set forth in 20 C.F.R. § 404.1527(d) including, at a

minium, the factors of supportability, consistency, and specialization.  *See* 20

C.F.R. § 404.1572(f); *see also* S.S.R. 96-6p, 1996 WL 374180, at *2-*3.

### C.    Analysis

#### *Mental Impairments*

Two of the alleged errors asserted by Plaintiff implicate the ALJ's handling

of record evidence regarding Plaintiff's mental impairments – *i.e.*, that the ALJ

did not consider all of Plaintiff's mental limitations (alleged error #2); and that he

did not properly evaluate mental health source opinions, including those of Dr.

Boerger, a consultative psychologist, and Dr. Nims and Ms. Ross, Plaintiff's

treating psychiatrist and counselor (alleged error #5).  (*See* Doc. #12 at 11, 12-13).

Ms. Ross and Dr. Nims, the treating mental health professionals whose

assessment Plaintiff advances, opined that since October 1, 2001, Plaintiff has had

<u>no</u> ability to complete a normal workday or workweek without interruptions,

and has had a "limited and unsatisfactory" ability to remember work-like

procedures, maintain attention, maintain regular attendance and be punctual,

and accept instructions and respond appropriately to criticism from supervisors.

(Tr. 243-45). Their opinion to that effect contrasts markedly with the testimony of

the medical expert, Dr. Schwartz, who noted that Plaintiff had no history of

mental health treatment prior to April 2004 (Tr. 395-96, 398-99), and felt that the

only psychologically-based restrictions on Plaintiff's ability to work should be

limitations to small groups, lower stress jobs, and only occasional contact with

others. (Tr. 397, 408). As to Dr. Boerger's opinion that Plaintiff would be

moderately to markedly restricted in her ability to relate to supervisors and

fellow workers and to withstand the stress and pressures associated with day-to-

day work activity, and mildly to moderately restricted in her ability to

understand and follow instructions (Tr. 219), Dr. Schwartz testified that such

opinion also "presents a more mild or benign picture" than that endorsed by Ms.

Ross and Dr. Nims. (Tr. 407).

Discussing the Ms. Ross/Dr. Nims opinion in his decision, the ALJ stated

as follows:

> As noted by Dr. Swartz [sic], [the medical source
> statement prepared by Ms. Ross and signed by Dr.
> Nims] is more restrictive than [the opinion] set forth by
> Dr. Boerger, but still documents the ability to perform
> many activities. In addition, [Dr. Schwartz] also noted
> that this assessment was contrasted by treatment notes
> demonstrating decreased depression and anxiety and
> increased activities. Further, although Dr. Nims signed
> the assessment, the record contains no treatment records
> from him and only references his participation in

26

periodic medical record reviews.  This assessment
purports to preclude the claimant from sustained work
activity, but it is not supported by the treatment records
contained in the record, nor is it consistent with the
assessment of Dr. Boerger.  Accordingly, it is found that
the medical source statement is not entitled to
significant weight.

(Tr. 23).

Because the record thus demonstrates that the treating mental health

sources' opinion both was inconsistent with other substantial evidence of record

and lacked support in the form of medically acceptable data, the ALJ was

justified in declining to accord that opinion controlling weight.  *See* 20 C.F.R. §

404.1527(d)(2); *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544.  The ALJ therefore

did not err by failing to apply the treating physician rule to the joint opinion of

Dr. Nims and Ms. Ross.

That lack of deference to the treating source opinion, however, triggered

the ALJ's duty to continue evaluating that opinion subject to "a host of other

factors."  *See id*.  Again, the record confirms that the ALJ complied with the

applicable regulations.  As to "the length, frequency, nature, and extent of the

treatment relationship," the ALJ specifically observed that among the many

pages of medical records from the Miami County Mental Health Center (*see* Tr.

238-354), no records of Dr. Nims actually treating Plaintiff appear, "only

27

references [to] his participation in periodic medical record reviews." (Tr. 23).

Regarding "supportability and consistency," ALJ Armstead noted that the

treating sources' opinion appears to conflict not only with those of Dr. Schwartz

and Dr. Boerger, but also with information contained within treatment notes

from their own clinic. (*See id*.). For example, he referred to November 2005

treatment notes reflecting that Plaintiff "was increasing her activities and

engaging in activities she previously enjoyed, but not for years" (Tr. 18, 22; *see* Tr.

285), as well as 2006 treatment notes documenting "a stable mood and decreased

depression and anxiety," and "improvement in her condition with treatment

despite the fact that she [ ] missed many scheduled appointments." (Tr. 22; *see,*

*e.g.*, Tr. 247 [7/20/06, "thinks meds helping," decreased depression]; 252

[7/13/06, "doing well"], 254 [6/29/06, "discharged from treatment," case

management only]).

    Although the ALJ did not comment specifically on the "specialization" of

Dr. Nims, his omission of this factor was inconsequential given that Dr. Schwartz

and Dr. Boerger, too, were qualified mental health professionals. *See* 20 C.F.R. §

404.1513(a)(1), (2) [providing that either licensed physicians or "licensed or

certified psychologists" may serve as "acceptable medical sources"]. However,

he did address one "other relevant factor" – *i.e.*, "that the record contained no

evidence documenting psychological problems as [of] the alleged disability onset date of October 1, 2001." (Tr. 18; *see also* Tr. 17 ["the record contains no complaints of emotional difficulty or impairment until . . . April 9, 2004"]). That lack of corroborating medical documentation, too, could be a pertinent consideration lending support to the ALJ's conclusion that the treating sources' opinion that Plaintiff had been disabled since October 2001 was less credible than other mental health source opinions of record.

The ALJ also evaluated those other mental health source opinions, as follows:

> [S]ignificant weight is given to the opinions of Dr. Swartz [sic] and the State Agency medical consultants. Each opinion is well-supported by the substantial weight of the evidence, including test results and clinical findings. Dr. Swartz [sic] thoroughly summarized the record and concluded that the records noted increased activities and decreased depression and anxiety and that they supported the ability to perform the work activity set forth above. Further, the opinion of the State Agency medical consultant is consistent with the objective test results and clinical findings and is not contradicted by substantial evidence elsewhere in the record. Accordingly, it is entitled to significant weight.

(Tr. 22-23). Bolstering those conclusions, the ALJ reiterated details of Dr. Schwartz's testimony (*see* Tr. 18-19), and acknowledged that Dr. Stinson "reviewed the evidence . . . [and] concluded that the claimant did exhibit

symptoms of anxiety and depression, but appeared capable of" working with certain limitations. (Tr. 17). Accordingly, it appears that ALJ Armstead applied the correct legal standards to the psychological medical source opinions, and that his conclusions are supported by substantial evidence.

Plaintiff also argues, however, that the ALJ did not consider "all of the limitations of her mental impairment." (Doc. #12 at 11, alleged error #2). Although Plaintiff does not elaborate on the additional limitations that she contends the ALJ should have considered, the record demonstrates that the ALJ included in his residual functional capacity assessment all psychologically-based limitations that he believed to be credible. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Entler v. Comm'r of Soc. Sec.*, 73 Fed. Appx. 868, 871 (6th Cir. 2003) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Here, the ALJ found that Plaintiff did have the "severe impairments" of "dysthymic and generalized anxiety disorders" (Tr. 15), which "could reasonably be expected to produce" some of her claimed symptoms. (Tr. 21). The ALJ concluded, however, that Plaintiff's description of the intensity, persistence and

limiting effects of those symptoms was "not entirely credible." (*Id.*). He noted, for example, that Plaintiff "is able to perform household chores and take care of her personal needs," and "has friends with whom she socializes." (Tr. 19; *see also* Tr. 21). Recognizing that Plaintiff reported her activity level to be "very limited," the ALJ nonetheless concluded that "if her lifestyle is actually as restricted as she testified, such a lifestyle can only be attributed to a matter of choice rather than to a matter of medical necessity." (Tr. 22). He mentioned Plaintiff's testimony that she did not go anywhere or do anything because "I don't want to." (Tr. 19, quoting Tr. 384).

Based on those limitations that he <u>did</u> find to be credibly attributable to Plaintiff's mental impairments, the ALJ imposed a restriction limiting Plaintiff to working low-stress jobs "in a small group setting with no more than occasional contact with co-workers and supervisors." (Tr. 20). Although the VE did testify, on questioning from Plaintiff's attorney, that needing to nap two hours during the workday (Tr. 433) or having other limitations as suggested by Dr. Nims and Ms. Ross (Tr. 434-35) would preclude an individual from maintaining employment, the ALJ apparently was not convinced that either napping or the other suggested restrictions would be a legitimate product of Plaintiff's mental impairments.

Because the ALJ applied the proper legal standards in assessing the credibility of Plaintiff's mental health symptoms (*see* Tr. 20); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c); S.S.R. 96-7, and because substantial evidence supports his conclusions, the ALJ did not err by failing to impose restrictions for all of the limitations that Plaintiff claimed were attributable to her mental impairments. *See Walters*, 127 F.3d at 528 (court must affirm Commissioner's conclusions absent determination that Commissioner failed to apply correct legal standards or made findings of fact unsupported by substantial evidence in record); *see also Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir.1993).

### *Physical Impairments*

Four of Plaintiff's remaining allegations of error relate to the ALJ's handling of record evidence regarding Plaintiff's physical impairments – *i.e.*, that the ALJ did not credit Dr. Danopulos's findings that would limit Plaintiff to less than a medium level of exertion (#1); that he did not consider all of Plaintiff's physical limitations (#3); that he considered neither her obesity in combination with her other impairments nor the effects of the reduced grip in her right hand on her ability to perform work-related functions (#4); and that he did not apply the proper definition of "medium" work in evaluating Plaintiff's residual functional capacity (#6).

As Plaintiff aptly notes, applicable regulations clarify the typical exertional

demands of the various levels of work for Social Security purposes.  For example,

"medium work" is defined as follows:

> (c) *Medium work*.  Medium work involves lifting no
> more than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or
> she can also do sedentary and light work.

20 C.F.R. § 404.1567.  In addition:

> . . .  A full range of medium work requires standing or
> walking, off and on, for a total of approximately 6 hours
> in an 8-hour workday in order to meet the requirements
> of frequent lifting or carrying objects weighing up to 25
> pounds.  As in light work, sitting may occur
> intermittently during the remaining time.  Use of the
> arms and hands is necessary to grasp, hold, and turn
> objects, as opposed to the finer activities in much
> sedentary work, which require precision use of the
> fingers as well as use of the hands and arms.
>
> The considerable lifting required for the full range of
> medium work usually requires frequent bending-
> stooping . . .   In most medium jobs, being on one's feet
> for most of the workday is critical.  Being able to do
> frequent lifting or carrying of objects weighing up to 25
> pounds is often more critical than being able to lift up to
> 50 pounds at a time.

S.S.R. 83-10, 1983 WL 31251, at *5.

In determining whether a plaintiff is able to perform a job that falls within

a particular exertional category, an ALJ must identify the pertinent evidence from

medical and non-medical reports which leads to his assessment of a claimant's residual functional capacity. *Garland v. Shalala*, 78 F.3d 584 [table], 1996 WL 99809, at *8 (6th Cir. 1996) (citing S.S.R. 85-16 at 2). Acknowledging that Plaintiff "suffers from several physical impairments that impose some restrictions on her functional capacity," the ALJ here nonetheless concluded that Plaintiff remained able to sustain work activity at the medium level. (Tr. 21). He noted that Plaintiff sought no treatment and took no medication for her alleged low back, leg and arm pain. (*Id.*). He also relied on the opinion of "the State Agency medical consultant" (presumably Dr. Weisenburger), who concluded that Plaintiff retained the residual functional capacity for a reduced range of medium work. (Tr. 21-22; *see* Tr. 204-11).

Significantly, however, nowhere does the ALJ's decision conduct the analysis of medical source opinion regarding Plaintiff's physical impairments that is mandated by 20 C.F.R. § 404.1572(f) and S.S.R. 96-6p. As Plaintiff offered no treating source opinion to substantiate the extent and effect of her physical impairments (*see* Tr. 21), the ALJ appropriately turned to the opinions of the non-treating medical sources. But without further elaboration, he adopted the opinion of a consultative physician presumed to be Dr. Weisenburger, who never examined Plaintiff, and discounted examining consultant Dr. Danopulos's

opinion "for its lack of significant objective and clinical findings."  (Tr. 21; *see also*

Tr. 22).  This constituted error.

Under the applicable regulations, ALJ Armstead was required to evaluate

these non-treating medical source opinions under the factors set forth in 20 C.F.R.

§ 404.1527(d), including, at a minium, the factors of supportability, consistency,

and specialization.  *See* 20 C.F.R. § 404.1572(f); S.S.R. 96-6p.  Having neglected to

discharge his obligation to do so, the ALJ left all subsequent findings derived

therefrom, including his conclusions about Plaintiff's residual functional

capacity, open to objection.

A review of Dr. Danopulos's opinion as advanced by Plaintiff does not

reveal that opinion to be "so patently deficient that the Commissioner could not

possibly credit" it.  *Wilson*, 378 F.3d at 547.  Consequently, the ALJ's errors in

handling that opinion were not harmless, *see Bowen*, 478 F.3d at 747-48; *Wilson*,

378 F.3d at 546-47, and Plaintiff's challenge to the ALJ's evaluation of the medical

source opinions regarding the limitations caused by her physical impairments is

well taken.[5]

## VI.    REMAND IS WARRANTED

---

[5]In light of the above review and the resulting need for remand of this case, as
determined *infra*, further analysis of Plaintiff's remaining contentions is unwarranted.

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence Four is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of Drs. Weisenburger and Danopulos under the legal criteria set forth in the Commissioner's Regulations and Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB or SSE.  Accordingly, the case must be remanded to the Commissioner and the ALJ under Sentence Four of

42 U.S.C. § 405(g) for further proceedings consistent with this Report and

Recommendations.

**IT THEREFORE IS RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Sharon S. Shields was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

November 20, 2009

                      s/Sharon L. Ovington
                          Sharon L. Ovington
                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).